IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Criminal Case No. 14-cr-00169-PAB-5

UNITED STATES OF AMERICA,

      Plaintiff,

v.

5.  ORLANDO MARTINEZ,

      Defendant.

_____

### ORDER
_____

      This matter comes before the Court on Defendant Orlando Martinez's Motion for

*Kastigar* Hearing and to Dismiss Indictment or Suppress Evidence Obtained in Violation

of His Fifth Amendment Rights [Docket No. 286].  On January 13, 2015, the Court held

a *Kastigar* hearing.  Docket No. 432.  Both parties filed supplemental briefs.  Docket

Nos. 446, 452.  This motion is fully briefed and ripe for disposition.

## I.  FINDINGS OF FACT

      Mr. Martinez is the owner of O's Pipes & Tobacco ("O's"), a retail establishment

located in Denver, Colorado that sells tobacco.  Ex. 4 at 13:2-4.[1]  Count One of the

indictment [Docket No. 1] charges Mr. Martinez under 18 U.S.C. § 371 with conspiracy

      (1) to defraud the United States Drug Enforcement Administration (DEA), an

---

[1]The Court uses this citation format to refer to exhibits admitted into evidence
during the *Kastigar* hearing.  Citations to hearing transcripts and transcribed witness
testimony will refer to the exhibit or docket entry in which the transcript appears,
followed by the page and line numbers where the cited testimony appears.  Citations to
all other exhibits will refer to the exhibit number or letter, followed by the bates
number(s), if applicable, of the pages where the cited material appears.

agency of the United States, for the purpose of impeding, impairing, obstructing, and defeating their lawful governmental functions of regulating controlled substances; (2) to defraud the United States Food and Drug Administration (FDA), an agency of the United States, for the purpose of impeding, impairing, obstructing, and defeating their lawful governmental functions of regulating drug labeling and approving new drugs, before introduction into interstate commerce; and (2) [sic] to commit certain offenses against the United States, that is, to violate Title 21, United States Code, Sections 841(a)(1) and (b)(1) by knowingly and intentionally possessing with the intent to distribute, dispensing and distributing controlled substances, to wit AB-Fubinaca, in violation of the Controlled Substances Act.

Docket No. 1 at 8. The indictment alleges that Mr. Martinez and other defendants "possessed, packaged, labeled, marketed, distributed and sold substances containing ADB-Pinaca and AB-Fubinaca" in products with brand names such as "10X," "Crazy Clown," or "Sunburst." *Id.* at 8-9, ¶¶ 31-32. The products were commonly referred to as "spice" or synthetic cannabinoids. *Id.* at 3, ¶ 9.

### A.  Immunized Testimony

On September 6, 2013, Mr. Martinez received a subpoena from the Colorado Attorney General's Office ordering him to appear and provide testimony under oath. Docket No. 286-1 at 2. On September 13, 2013, September 17, 2013, and October 10, 2013, Mr. Martinez was deposed by Assistant Colorado Attorney General Jeffrey Leake in *In the Matter of O's Pipes & Tobacco*. Ex. O at 1. The parties do not dispute that Mr. Martinez's testimony on these three dates (collectively, the "immunized testimony") was given pursuant to Colo. Rev. Stat. § 6-1-111, which provides that testimony compelled by the Colorado Attorney General "shall not be admissible in evidence in any criminal prosecution against the person so compelled to testify." § 6-1-111(1). Mr. Martinez's testimony covered several topics, including how he purchased spice products from

2

Creager Mercantile, the spice product brand names associated with the present case,

his interactions with Tony Worth, an employee of Creager Mercantile, and his

knowledge of the chemicals contained within certain spice products.  *See, e.g.*, Ex. 4 at

113:4-17; *see generally* Exs. 4-6.

### B.  Denver Police Department Investigation

In March and April 2012, investigators from the Denver Police Department

("DPD") confiscated spice products from O's.  Ex. 1 at 00018202.  DPD tests of the

seized products revealed that some of the products contained synthetic cannabinoids.

*Id.* at 0018202-03.  In March and April 2013 and on September 7, 2013, DPD

investigators conducted undercover purchases of spice products from O's, some of

which tested positive for synthetic cannabinoids.  *Id.* at 00018202-05.  On September

20, 2013, DPD arrested Mr. Martinez and executed a search warrant for O's and Mr.

Martinez's apartment, seizing several products that later tested positive for synthetic

cannabinoids.  *Id.* at 00018206-12.  Mr. Leake did not provide the DPD with information

concerning Mr. Martinez's immunized testimony until October 4, 2013 at the earliest.

Ex. O at 2, ¶ 5.

### C.  Aurora Police Department Investigation

Aurora Police Department ("APD") Investigator Craig Morgan testified that, on

September 5, 2013, APD conducted a controlled purchase of spice from Puff N Jewelry

in Aurora, Colorado.  Docket No. 443 at 9:18-23.  APD executed a search warrant of

Puff N Jewelry and seized several spice products.  Ex. 3A at 00022872-74.  Investigator

Morgan interviewed Puff N Jewelry's owner, Byung Keuk Lee, who explained that he

acquired spice products from a local company called Creager Mercantile and an online retailer called incensecenter.com.  Docket No. 443 at 12:25-13:3.  Mr. Lee told Investigator Morgan that to purchase spice products from Creager Mercantile Mr. Lee would contact a man he knew as "Tony W.," who would then deliver spice products to Puff N Jewelry that day.  *Id.* at 24:22-25:4.  Mr. Lee provided APD with five invoices for spice purchases from Creager Mercantile and the phone number he used to contact Tony W.  *Id.* at 20:1-6.  Mr. Lee also stated that Tony W. told Mr. Lee that several stores including "Orlando's" were currently selling "incense."  *Id.* at 19:5-11; Ex. 3A at 00022762.

On September 9, 2013, through law enforcement databases, Investigator Morgan identified Tony W. as Tony Worth, a Creager Mercantile employee.  Docket No. 443 at 17:15-19.  APD began surveillance on Mr. Worth independent of any other agency.  *Id.* at 18:2-9.  APD Investigator John Borquez replaced Investigator Morgan as the primary contact for APD with respect to this investigation.  *Id.* at 17:3-8.  Investigator Morgan did not know when APD informed the United States Department of Justice Drug Enforcement Administration ("DEA") of the Puff N Jewelry investigation or when APD provided the DEA with a copy of the APD investigation report.  *Id.* at 32:14-24.

### D.  DEA Investigation

DEA Special Agent Michael Marshall was the primary agent assigned to this case.  Shortly before September 15, 2013, Special Agent Marshall was contacted by the Brunswick, Georgia Police Department, an agency that had just made an arrest related to the sale of spice products in Georgia.  *Id.* at 37:10-23.  The individual in

custody ("CS1") told local authorities that CS1's spice products came from Colorado through an individual named James Johnson.  *Id.*  Special Agent Marshall spoke with Investigator Borquez, who indicated to Special Agent Marshall that APD had identified Mr. Worth as the individual supplying spice products to Puff N Jewelry.  *Id.* at 38:12-18. Based upon that information and James Johnson's cell phone records, Special Agent Marshall identified Mr. Worth as a person of interest.  *Id.* at 39:8-11.  On September 17, 2013, Special Agent Marshall interviewed CS1 in Colorado.  *Id.* at 37:21-23.

On September 19, 2013, Special Agent Marshall attended a meeting of several local law enforcement agencies (the "September 19 meeting").  Investigator John Borquez from the APD and representatives from the North Metro Task Force were present at the meeting.  Docket No. 443 at 38:10-16.  The parties agree that Mr. Leake discussed the contents of Mr. Martinez's September 13 and September 17 testimony at the meeting.  Ex. O at 1.  Special Agent Marshall testified that September 19 was the first time he heard anything about Mr. Martinez.  Docket No. 443 at 58:2-4.  However, Special Agent Marshall had no specific recollection of what Mr. Leake said at the September 19 meeting; thus, the extent to which Mr. Leake discussed the immunized testimony is unclear.  Special Agent Marshall recalled speaking to APD investigators about Creager Mercantile, Tony Worth, and the Puff N Jewelry investigation.  Docket No. 443 at 40:4-16.  However, there is no evidence that APD discussed Mr. Martinez with Special Agent Marshall.  Special Agent Marshall testified that, as of September 19, 2013, he had no information regarding the DPD's investigation of Mr. Martinez, *id.* at 44:7-16, but did not otherwise recall when he became aware of the DPD's investigation except to say that it was "possible" that he spoke with DPD prior to preparing wiretap

5

affidavits in December 2013 or January 2014.  *Id.* at 47:1-5.  On cross examination, Special Agent Marshall testified that he read transcripts of the immunized testimony before he saw any reports from DPD.  *Id.* at 72:23-73:1.

On October 4, 2013, Mr. Leake sent transcripts of Mr. Martinez's September 13 and September 17 testimony to the DEA, and, on October 16, 2013 Mr. Leake sent a transcript of Mr. Martinez's October 10 testimony (collectively, the "transcripts") to the DEA, including Special Agent Marshall and Intel Analyst Kyle McGee.  Ex. O; Docket No. 443 at 68:6-10.  Special Agent Marshall testified that he continued to speak with Mr. Leake about Mr. Martinez and the investigation generally, but does not recall the substance of those conversations.  Docket No. 443 at 62:9-21.  Special Agent Marshall testified that he did not use any procedures to segregate the transcripts from other federal agents involved in the DEA's investigation.  Docket No. 443 at 89:1-4.  Special Agent Marshall testified that he did not rely on any information provided by Mr. Leake, either orally or in transcript form, in investigating this case.  Docket No. 443 at 42:11-14. However, as discussed below, Special Agent Marshall's testimony on this point was inconsistent.

On November 12, 2013, Special Agent Marshall interviewed Mr. Worth for the first time (the "November 12 interview").  Ex. M.  The initial interview was conducted by Special Agent Marshall, United States Bureau of Alcohol Tobacco and Firearms Task Force Officer James Caffrey, Internal Revenue Service Intel Analyst Kyle McGee, Investigator Borquez, North Metro Task Force Officers Ray Padilla and Doug Kelsey, and DEA High Intensity Drug Trafficking Area Analyst Karin Hopper.  *Id.*  Special Agent Marshall, Intel Analyst McGee, and Analyst Hopper conducted a second interview with

Mr. Worth.  *Id.*  Prosecutor Anne Marie Braun from the Colorado Attorney General's Office was also present for the interviews.  *Id.*  The government offered no evidence concerning how the investigators conducting the interviews developed the questions asked of Mr. Worth.  However, it seems likely that, in addition to Special Agent Marshall and Investigator Borquez, several of the questioners had been exposed to the transcripts or attended the September 19 meeting.  Mr. Worth provided information regarding the manufacture, distribution, and sale of spice products, *id.*, but did not identify or otherwise mention Mr. Martinez during the November 12 interview.  *Id.* at 55:19-22.

In December 2013 and January 2014, Special Agent Marshall read the transcripts in the course of preparing affidavits in support of applications for wiretaps. *Id.* at 60:19-61:5.  Special Agent Marshall did not recall how many of the three transcripts he reviewed, *id.* at 61:13-16, and, with one exception, could not recall having read specific facts from transcripts.  *Id.* at 71:11-72:12.  He admitted that he would not have known about Mr. Martinez's procedure for obtaining spice from Creager Mercantile or how Mr. Martinez learned about spice products until reading the transcripts.  *Id.* at 70:8-71:1.  The wiretap affidavit and application on cellular phones associated with James Johnson was filed on February 14, 2014 and states, in relevant part, "Colorado State Assistant Attorney General Jeffrey Leake sent your affiant a correspondence that was seized from Orlando MARTINEZ who owns O's Tobacco shop in Colorado.  MARTINEZ was supplied synthetic cannabinoids from the Creager Warehouse."  Ex. 10A at 00008157-58; Ex. 10 at 00008136.  Special Agent Marshall

assumes that Mr. Leake acquired this information from Mr. Martinez's immunized testimony.  Docket No. 443 at 84:2-7.

Special Agent Marshall also prepared affidavits in support of search warrants for James Johnson's residence and Creager Mercantile.[2]  The affidavits[3] mention Mr. Lee's statement that Mr. Worth told him that "Orlando's" also sold spice products.  *See, e.g.*, Ex. 8 at 00008857-58.  The affidavits mention a September 9, 2013 undercover operation conducted by Colorado Liquor Investigators and the Colorado Attorney General where spice was purchased and later seized from O's.  *Id.* at 00008863-64. Special Agent Marshall testified that he learned of the Colorado Department of Revenue's investigation of O's in the fall of 2013, but he also stated that the Colorado Department of Revenue was participating in the investigation of O's with the Colorado Attorney General's office.  Docket No. 443 at 50:3-18.  However, the government offered no testimony from either agency concerning the degree to which the immunized testimony was discussed during the state investigation of Mr. Martinez and O's.  The affidavits contain the following paragraph:

> A later interview of Orlando MARTINEZ by the Colorado Attorney General's Office revealed Orlando MARTINEZ was purchasing large amounts of synthetic cannabinoid products from CREAGER MERCANTILE located at 4900 Acoma Street in the City and County of Denver, Colorado.  Numerous invoices with the CREAGER MERCANTILE logo were discovered inside the

---

[2]Although it is somewhat unclear precisely when Special Agent Marshall prepared the affidavits in support of the search warrants, Special Agent Marshall's testimony indicates that his primary review of the transcripts took place in December 2013 and January 2014.

[3]The affidavit in support of the search warrant for Mr. Johnson's residence contained substantially the same information as the affidavit in support of the search warrant for Creager Mercantile.  *See* Docket No. 443 at 52:9-20.

business during the search of the business.

Ex. 8 at 00008864.  During the investigation, Special Agent Marshall operated under the belief that the immunized testimony could be used in affidavits supporting search warrants or wiretap applications.  Docket No. 443 at 89:5-11.

The date upon which Mr. Worth first mentioned Mr. Martinez to Special Agent Marshall is unclear.  Special Agent Marshall testified that, after the November 12 interview, he was in frequent contact with Mr. Worth.  Special Agent Marshall testified that Mr. Martinez's name came up after the November 12 interview when investigators were trying to determine who Creager Mercantile was supplying with spice products, but Special Agent Marshall could not provide a specific date when Mr. Worth supplied this information.  Docket No. 443 at 55:5-56:6.  On April 24, 2014, Special Agent Marshall debriefed Mr. Worth.  Ex. 7.  The report from that interview states that Mr. Worth told investigators that "CREAGER supplied O's PIPES AND TOBACCO."  *Id.*  Special Agent Marshall testified:

> Q.  . . . are there any other reports out there, any other times that you met with Mr. Worth where he talked specifically about Mr. Martinez other than [Ex. M] and [Ex. 7]?
>
> A.  No.  I am sure that he spoke about him, but is it memorialized in a report other than what you just mentioned, no.

Docket No. 443 at 75:24-76:5.

### E.  Special Agent Marshall's Grand Jury Testimony

On May 5, 2014, Special Agent Marshall testified before the grand jury.  Ex. N.[4]

_____

[4]Special Agent Marshall appears to be the only witness to testify before the grand jury in this case, Docket No. 478 at 1, and the parties have not suggested otherwise.

Special Agent Marshall mentioned Mr. Martinez or O's in his grand jury testimony multiple times.  Special Agent Marshall testified to the grand jury that, as a result of speaking with Mr. Worth, he was able to identify Donald Creager and Creager Mercantile as receiving and distributing spice products to "local retailers, some of them being O's Tobacco and Pipe Shop and Puff and Jewelry."  *Id.* at 8:2-17.

> Q  With regards to what CS-3 told you about Orlando Martinez here locally, what was he telling you about the relationship that Orlando Martinez had with Creager warehouse?
>
> A  Orlando Martinez was a customer, a synthetic cannabinoid customer, of Donald Creager.  CS-3 was responsible for delivering and transporting some of the synthetic cannabinoids from the Creager warehouse to Orlando.
>
> Q  Did that happen over a period of years?
>
> A  It did.
>
> Q  O's Pipe and Tobacco, who is the owner of that?
>
> A  Orlando Martinez.
>
> Q  Did he deal directly with Orlando Martinez when filling orders?
>
> A  He did.

*Id.* at 18:11-19:1.  At the *Kastigar* hearing, Special Agent Marshall testified that he received the above-mentioned information from Mr. Worth.  He testified that he received this information at or after the November 12 interview, but did not otherwise recall when Mr. Worth provided information specific to Mr. Martinez.  Docket No. 443 at 91:4-92:10.  Special Agent Marshall told the grand jury that

> We know from CS-3 that Donald Creager continued to sell synthetic cannabinoids.  We've also intercepted invoices between Creager warehouse and Orlando's, as well as Creager warehouse and Puff and Jewelry in Aurora, with invoices for the brand names that we've already discussed: 10X, 20X, Requiem, Crazy Clown, Crazy Tape.

10

Ex. N at 32:22-33:3.  At the *Kastigar* hearing, Special Agent Marshall testified that he did not recall the source of the invoices between Creager Mercantile and O's referenced in his grand jury testimony.  Docket No. 443 at 92:11-24.[5]

Special Agent Marshall testified to the grand jury that the brands 10X, 20X, XXX, XXX Extreme, Requiem, Crazy Clown, and Sunburst were the focus of this case.  Ex. N at 53:14-23.  At the *Kastigar* hearing, Special Agent Marshall testified that Mr. Leake's debrief on September 19, 2013 was the first point at which he would have been able to connect those brands to Mr. Martinez.  Docket No. 443 at 93:13-17.  Special Agent Marshall did not take any steps to ensure that his grand jury testimony was not based directly or indirectly on the immunized testimony.  *Id.* at 89:23-90:2.

On May 5, 2014, the grand jury returned an indictment against nine defendants, including Mr. Martinez.  Docket No. 1.

## II.  CONCLUSIONS OF LAW

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V, cl. 3.  "'Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent,

---

[5]Mr. Martinez's name was mentioned an additional time:
Q  Now, when these products are distributed to wholesalers like Donald Creager or retailers like Dandia, Karfias, Christensen, Chastain, or Martinez, are they clearly marked on the packages with some representation as to limitations on use?
A  The packages say not for human consumption.
Ex. N at 14:23-15:3.

legitimate source for the disputed evidence.'"  *Kastigar v. United States*, 406 U.S. 441, 460 (1972) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n.18 (1964));  *see also United States v. Lacey*, 86 F.3d 956, 972 (10th Cir. 1996).  "Requiring the prosecution to shoulder this burden ensures that the grant of immunity has 'le[ft] the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a grant of immunity.'"  *United States v. Hubbell*, 530 U.S. 27, 40 (2000) (quoting *Kastigar*, 406 U.S. at 458-459).  Courts will generally "parse the evidence" to whatever degree is necessary to separate evidence tainted by immunized testimony from evidence untainted by immunized testimony.  *United States v. Slough*, 641 F.3d 544, 550 (D.C. Cir. 2011);[6] *see also United States v. North* ("*North I*"), 910 F.2d 843, 872 (D.C. Cir. 1990), *opinion withdrawn and superseded in part by*, *United States v. North* ("*North II*"), 920 F.2d 940 (D.C. Cir. 1990) ("inquiry at [*Kastigar* hearing] must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item").  If the prosecution fails to show that the evidence presented to the grand jury has been properly "'derived from legitimate independent sources,' then the indictment must be dismissed, unless the error is held harmless, beyond a reasonable doubt."  *United States v. Beery*, 678 F.2d 856, 863 (10th Cir. 1982) (citation omitted) (quoting *Kastigar*, 406 U.S. at 461).

Here, the parties do not dispute that Mr. Martinez gave the immunized testimony

---

[6]Proof that a witness was "never exposed to immunized testimony" or that the witness memorialized his testimony before exposure is generally sufficient to satisfy the government's burden.  *Id.*  However, Special Agent Marshall testified before the grand jury after his exposure to the immunized testimony.  Thus, neither situation is applicable to the present case.

under a state grant of immunity and that the immunized testimony relates to the present prosecution.  Thus, the only remaining question is whether the government has met its burden of showing that the evidence presented to the grand jury was derived from an independent source.[7]  Complicating this inquiry is the fact that neither party appears to have provided a complete accounting of all the evidence presented to the grand jury.  However, for the reasons stated below, the Court need only consider the substance of Special Agent Marshall's grand jury testimony in concluding that the government has failed to meet its burden.

### A.  Use of Immunized Testimony

#### 1.  The Government's Burden

The government cannot use in a subsequent prosecution of the witness the immunized testimony "or any evidence that was tainted – substantively derived, shaped, altered, or affected – by exposure to the immunized testimony.  Nor can the government use it to develop investigatory leads, to focus an investigation on a witness, or to motivate another witness to give incriminating testimony."  *United States v. Slough*, 641 F.3d 544, 549 (D.C. Cir. 2011) (citations and quotations omitted); *see also United States v. Ponds*, 454 F.3d 313, 322 (D.C. Cir. 2006) ("[*Kastigar*] prohibits *any*

---

[7]The D.C. Circuit requires a defendant to initially "lay a firm foundation resting on more than suspicion" that immunized testimony was before the grand jury.  *See North II*, 920 F.2d at 949 n.9.  Other circuits have declined to place such a burden on defendant.  *See United States v. Schmidgall* ("*Schmidgall I*"), 25 F.3d 1523, 1530 (11th Cir. 1994 ("the defendant is not required to present evidence that the grand jury testimony was in fact tainted").  The Tenth Circuit does not appear to have adopted either approach.  Nonetheless, the fact Special Agent Marshall read the transcripts and regularly communicated with Mr. Leake during the investigation and before his grand jury testimony is sufficient to satisfy whatever burden Mr. Martinez may have to show that Special Agent Marshall's grand jury testimony was tainted.

use [of compelled testimony], direct or indirect").[8]  The prosecution's burden "is not

limited to a negation of taint," *Kastigar*, 406 U.S. at 460; rather, "the prosecutor has to

*prove* that witnesses who testified against the defendant did not draw upon the

immunized testimony to use it against the defendant.  *North II*, 920 F.2d at 943.  The

Tenth Circuit has described this as a "heavy burden,"[9] which cannot be satisfied with

conclusory assertions or general denials.  *See, e.g.*, *Beery*, 678 F.2d at 862-63 (holding

that *Kastigar* concerns were not satisfied by prosecutor's statement that he "had

nothing to do with" potentially immunized testimony); *Schmidgall I*, 25 F.3d at 1528 ("A

government's agent's denials that he made use of the immunized testimony, standing

alone, are generally insufficient to meet the government's burden, even if made in good

faith.").

In *Schmidgall I*, a customs agent was provided notes from the defendant's

immunized interview.  25 F.3d at 1526.  The agent, who did not know that the

_____

[8]Although the Tenth Circuit does not appear to have decided the issue, courts
are divided on whether *Kastigar* prohibits both evidentiary and non-evidentiary use of
immunized testimony, an example of the latter being a prosecutor's use of immunized
testimony in preparing for trial.  *See Slough*, 641 F.3d at 553-54 (noting circuit split);
*North I*, 910 F.2d at 857; *Schmidgall I*, 25 F.3d at 1530 (holding that use of immunized
testimony in questioning a witness was improper "evidentiary" use).  However,
regardless of which approach the Tenth Circuit would follow, *Kastigar* prohibits the use
of compelled testimony as an "investigatory lead" or the use of "any evidence obtained
by focusing investigation on a witness as a result of his compelled disclosures."  406
U.S. at 460.  For the reasons discussed below, the government fails to establish that its
use of the immunized testimony did not fall into the category of uses prohibited by
*Kastigar* itself.  *See Chavez v. Martinez*, 538 U.S. 760, 770-71 (2003) (describing
*Kastigar*'s protections as an "evidentiary privilege").

[9]The prosecution's burden is not "heavy" in the evidentiary sense; rather,
although the government must "meet its proof only by a preponderance of the
evidence," any failure to meet the constitutional standard "must result in exclusion of
the testimony."  *North I*, 910 F.2d at 873.

14

defendant's testimony was protected, briefly perused notes from the interview and filed

them away, but did not again read them. *Id.* The agent was subsequently the primary

questioner in an extensive debrief of a key witness and continued to discuss the case

with various investigators. *Id.* at 1526-27. The agent testified before the grand jury.

During a *Kastigar* hearing on the resulting indictment, the government asked the agent

to explain the source of each line of his grand jury testimony, which the agent did by

reference to interviews of witnesses other than the defendant. *Id.* at 1529. The

Eleventh Circuit determined that the government did not satisfy its burden to show that

the agent's grand jury testimony was from an independent source in part because it

failed to corroborate the agent's claim that he gathered no substantive information from

the interview notes. *Id.* Moreover, the government failed to establish that the agent's

questioning of other witnesses "was in no way influenced by immunized testimony." *Id.*

at 1530.

    In *United States v. Hampton*, 775 F.2d 1479, 1480 (11th Cir. 1985), Bryant

Hampton provided immunized testimony to state prosecutors on two occasions,

transcripts and recordings of which were turned over to federal agents. State

investigators also regularly briefed federal agents on the state investigation. *Id.*

Materials from the state investigation were in general circulation among federal agents

as they investigated Warren Musselwhite, including Internal Revenue Service Agent

Thomas Altif, who reviewed a recording of the immunized testimony and reports

prepared by state investigators. *Id.* at 1482. After Mr. Musselwhite reached a plea

agreement with prosecutors and agreed to testify against Mr. Hampton, Mr. Hampton

was indicted based upon Mr. Musselwhite's and Agent Altif's testimony. *Id.* at 1482-83.

Federal officials had no procedures in place to shield themselves from the immunized

testimony or ensure that no evidence was derived therefrom. *Id.* at 1483. Mr. Hampton

brought a *Kastigar* challenge to the indictment. The Eleventh Circuit held that, because

federal agents relied on the state investigative materials in presenting facts to the grand

jury,

> it was incumbent upon the appellee in this case to demonstrate not only that
> Hampton's immunized testimony was not used by federal officials either
> directly or as an investigatory lead, but that any other information or
> materials conveyed by state officials and utilized either directly or indirectly
> by federal officials was not derived in whole or in part, directly or indirectly,
> from Hampton's immunized testimony.

*Id.* at 1487. Aside from legally insufficient "conclusory denials of use or derivative use,"

the government "made little effort to affirmatively trace each item of evidence that may

have been considered by the indicting grand jury." *Id.* The court dismissed the

indictment against Mr. Hampton. *Id.* at 1491.

## 2. *Evidence Before the Grand Jury*

The Court begins its inquiry with an analysis of the evidence presented to the

grand jury. The government contends that it can satisfy its burden by tracing "the

evidence used in the affidavits, and ultimately before the grand jury, to evidence it had

before September 19, 2013." Docket No. 446 at 3. However, assuming that Special

Agent Marshall's testimony was the only testimony presented to the grand jury, the

government fails to explain how each piece of evidence or line of testimony was derived

from a source independent of the immunized testimony. Although courts are required to

undergo a line-by-line, piece-by-piece analysis of the evidence to determine an

16

independent source, the deficiency of the government's showing makes such an analysis impossible and is, by itself, a sufficient basis to conclude that the government failed to meet its burden. *Cf. Hampton*, 775 F.2d at 1487. Even if such an analysis were possible, for the reasons discussed below, the unprotected circulation of the immunized testimony among DEA agents working on this case renders the "prospect of tracing all of the evidence accumulated during the course of the investigation and used as investigatory leads to sources wholly independent of [the immunized testimony] unrealistic at best." *Id.* at 1490.

Nonetheless, the Court will consider the remainder of the government's arguments. The government's position appears to be that "all the information provided in Orlando Martinez's deposition testimony . . . was already known to the Aurora Police Department and constitutes an independent relevant source." Docket No. 446 at 7. The government argues that, prior to September 19, 2013, the APD investigation identified Mr. Worth as a person of interest and identified Mr. Martinez as a potential spice retailer. *Id.* at 4-5. The government argues that "information regarding the identity of Tony W, Creager Warehouse, the methods of operation, . . . and the spice brands in issue" were known to Special Agent Marshall prior to September 19, 2013 and that the references to Mr. Martinez in the search warrant affidavits could have been based on information that was already known to APD and available to the DEA on or before September 5, 2013 *Id.* at 5-6.[10] Such arguments are, however, insufficient to meet the government's

---

[10]The government claims that Mr. Martinez's involvement was also known to Special Agent Marshall prior to September 19, 2013, but the cited testimony does not support such a claim. *See id.* To the contrary, Special Agent Marshall testified that the September 19 meeting was the first time he learned anything about Mr. Martinez.

burden.

First, the government's claim that, prior to September 19, 2013, APD knew "all the information provided in Orlando Martinez's deposition testimony" is without support. *See* Docket No. 446 at 7. The APD investigation of Puff N Jewelry revealed Mr. Worth's identity, basic information regarding Creager Mercantile's spice distribution procedures, brand names of certain spice products, and provided some indication that Mr. Martinez sold spice products purchased from Creager Mercantile. The immunized testimony discusses each of these topics in far greater detail, especially with respect to Mr. Martinez's personal knowledge, and contains specific information regarding additional aspects of the charged conspiracy. *See, e.g.*, Ex. 5 at 187:12-197:5 (discussing Mr. Worth and Creager Mercantile); Ex. 4 at 114:2-118:7 (discussing Mr. Martinez's knowledge of the chemical makeup of Crazy Clown and spice product brand names). Thus, there is no foundation for the government's claim that the APD investigation produced the same information as that which is contained in the immunized testimony. Moreover, the *Kastigar* hearing testimony established that Special Agent Marshall received information regarding the Puff N Jewelry investigation that was "general in nature," Docket No. 443 at 38:12-18, and that Mr. Martinez's name was first communicated to Special Agent Marshall by Mr. Leake during the September 19, 2013 meeting. The fact that the APD may have possessed additional information that was not communicated to Special Agent Marshall is irrelevant. *See Ponds*, 454 F.3d at 328 ("'[t]he government cannot escape its error simply by showing the availability of wholly

---

Docket No. 443 at 58:2-4.

independent evidence from which it *might* have procured indictment or conviction had it not used the immunized testimony'" (quoting *United States v. Pelletier*, 898 F.2d 297, 303 (2d Cir. 1990))).[11]

Second, although the government admits that it must "'demonstrate that each step of the investigative chain through which the evidence was obtained is untainted,'" Docket No. 446 at 9 (quoting *Schmidgall I*, 25 F.3d at 1528), the government's tracing analysis stops on September 19, 2013.  As a result, the government does not address the immunized testimony's circulation after that date and what effect, if any, it had on the investigation.  Even though Special Agent Marshall testified that he did not rely on the immunized testimony, the facts presented do not corroborate such a statement, rendering it legally insufficient.  *See Hampton*, 775 F.2d at 1491.

Turning first to direct exposure to the transcripts, Special Agent Marshall does not dispute that he read the transcripts in December 2013 and January 2014.  He admitted that the transcripts were his initial source of information concerning Mr. Martinez's procedure for obtaining spice products from Creager Mercantile, Docket No. 443 at 70:8-71:1, a topic on which Special Agent Marshall testified before the grand jury.  *See* Ex. N at 18:11-19:1.  Special Agent Marshall's inability to otherwise recall what facts he learned from reading the transcripts is insufficient to establish that his review of the transcripts did not lead to additional evidence or otherwise shape his investigation.  *See, e.g.*, Ex. 7; *see also Schmidgall I*, 25 F.3d at 1528 ("Prohibited indirect derivation

---

[11]To the extent the government relies upon information gathered by DPD, the same reasoning applies.  Special Agent Marshall testified that he read the immunized testimony in December 2013 and January 2014, prior to viewing DPD reports.  *See* Docket No. 443 at 72:23-73:1.

includes using immunized testimony to help shape the questioning of another witness.").

Special Agent Marshall appears to have had considerable indirect exposure to the immunized testimony. Special Agent Marshall testified that he and Mr. Leake continued to discuss the investigation, including Mr. Martinez, on a regular basis. Docket No. 443 at 62:9-12. Special Agent Marshall testified that, in addition to debriefs conducted on November 12, 2013 and April 24, 2014, he was in frequent contact with Mr. Worth, but did not recall specifics from their discussions. The government provided no evidence of what information he used when questioning Mr. Worth or, for that matter, any of the other individuals Special Agent Marshall spoke with during his investigation. *See United States v. Schmidgall* ("*Schmidgall II*"), 25 F.3d 1533, 1538 (11th Cir. 1994) ("The actual interrogation of Purvis was not recorded, so we are unable to compare the information elicited from Schmidgall with questions posed to Purvis to determine if the former shaped the latter."). No procedures were put in place to manage exposure to the immunized testimony from which one could infer that the immunized testimony played no role in the investigation. Rather, Special Agent Marshall was apparently operating under the belief that immunized testimony could be used in his investigation. Despite the fact that Special Agent Marshall appears to have had considerable exposure to the immunized testimony, the government makes no attempt to establish that the immunized testimony did not provide an investigatory lead or shape Special Agent Marshall's questioning of Mr. Worth – the source upon which Special Agent Marshall claims that much of his grand jury testimony is based – and of other individuals. *See Schmidgall*,

25 F.3d at 1530.[12]  Thus, the government has fallen short of demonstrating that each step of the investigative chain was untainted, a failure which compels the conclusion that Special Agent Marshall's investigation "was tainted within the meaning of *Kastigar*."  *See Schmidgall II*, 25 F.3d at 1538.

### 3.  Motivating Effect on the Investigation

Once it appears that immunized testimony was introduced into an investigation and that the investigation was motivated by both tainted and untainted sources, some courts permit the government to meet its *Kastigar* burden by showing that the government's investigators "'would have taken the same steps entirely apart from the motivating effect of the immunized testimony.'"  *Slough*, 641 F.3d at 551 (quoting *United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995)).  Here, this requires the government to establish, by a preponderance of the evidence, that Special Agent Marshall would have given the same testimony to the grand jury in the absence of his exposure to the immunized testimony.  *Id.*

The government has not shown that Special Agent Marshall's grand jury testimony would have been the same had he or other agents not been exposed to the immunized testimony.  This is not a case where an investigation was substantially complete prior to circulation of immunized testimony, *cf. United States v. Kiser*, 948 F.2d

---

[12]Moreover, the DEA report indicates that Ms. Braun from the Colorado Attorney General's Office and Investigator Borquez were present during the November 12, 2013 interview.  Ex. M at 1.  In the absence of evidence to the contrary, it is reasonable to assume that Ms. Braun had knowledge of the immunized testimony and that Investigator Borquez learned of the immunized testimony during the September 19 meeting and therefore that their participation in the interview, even if indirect, was in some way shaped by the immunized testimony.

418, 423 (8th Cir. 1991) (holding that investigative file "outlined the connection between Kiser and Marrero" and that the government "initiated no investigation based on Kiser's information"), or a case where investigators took steps to limit their exposure to immunized testimony.  *Cf. Nanni*, 59 F.3d at 1435.  Before September 19, 2013, Special Agent Marshall had, at most, identified Mr. Worth as a person of interest and Creager Mercantile as a potential distributor of spice products.  As a result of his interview with CS1 and discussions with APD, Special Agent Marshall may have also known the brand names of certain spice products distributed through Creager Mercantile.  Although perhaps not extremely detailed, Special Agent Marshall's grand jury testimony went beyond that general information and his testimony was broader in scope.  *See generally* Ex. N.  Moreover, Special Agent Marshall testified that Mr. Worth was the source of his testimony regarding Mr. Martinez's involvement in the charged conspiracy, but Mr. Worth was not interviewed until November 2013.  As a result, there is little basis to conclude, as the government urges, that "[m]ost of the information presented" to the grand jury was first revealed prior to September 19, 2013.  *Cf. Schmidgall II*, 25 F.3d at 1537.

Based upon information in his possession prior to September 19, 2013, Special Agent Marshall undoubtedly would have pursued Mr. Worth, regardless of whether Special Agent Marshall had information from the immunized testimony.  However, on November 12, 2013, Mr. Worth was interviewed by multiple people who had been exposed to the immunized testimony and the government makes no attempt to establish that the questions posed to Mr. Worth were not derived from the immunized testimony.  *See Schmidgall*, 25 F.3d at 1530 (holding that government must show that questioning of source "was in no way influenced by immunized testimony").  Special Agent Marshall

22

had several subsequent interactions with Mr. Worth, including an April 24, 2014 interview, but the government did not establish that information gathered from those interactions was not shaped by the immunized testimony.

The government's claims that the DEA did not rely on the immunized testimony are further contradicted by the affidavits prepared in support of wiretap applications and search warrants, which were prepared after Special Agent Marshall's first interview with Mr. Worth.  Although the affidavits contain information from sources other than the immunized testimony, if the DEA's investigation did not rely on the immunized testimony, as the government claims, one would not expect the affidavits to contain explicit references to the immunized testimony.  *See* Ex. 8 at 00008863-64; *see also* Ex. 10A at 00008157-58.

Moreover, concluding that Special Agent Marshall would have taken the same investigatory steps regardless of the immunized testimony is further complicated by the fact that Mr. Martinez does not appear to have been the initial target of the DEA's investigation.  Special Agent Marshall testified that his investigation was initially focused on locating the "source of supply" and that he "wasn't interested in an individual selling 'spice' in Denver" such as Mr. Martinez.  Docket No. 443 at 62:1-8.  Nonetheless, Special Agent Marshall recalls first learning of Mr. Martinez's identity at the September 19, 2013 meeting and first learning of Mr. Martinez's procedure for obtaining spice from Creager Mercantile upon review of the transcripts.  Information acquired after exposure to immunized testimony does not automatically run afoul of *Kastigar*, *cf. Nanni*, 59 F.3d at 1432, but here the government has not explained how, if at all, Special Agent Marshall would have identified Mr. Martinez as a target absent exposure to the

23

immunized testimony.

Perhaps the DEA could or would have learned most of the information contained in the transcripts through independent sources. However, the Court believes, in the context of compelled testimony and the finding of a *Kastigar* violation, it is inappropriate to speculate regarding those possibilities. Because the government has the burden of proving the motivating effect of the immunized testimony was insignificant, uncertainties are not resolved in its favor. Based upon the government's showing, it is too great a leap to assume that Special Agent Marshall's interviews of Mr. Worth would have been conducted in the same manner and that each of the numerous subsequent steps in the investigation would have taken place "entirely apart from the motivating effect of the immunized testimony," *Nanni*, 59 F.3d at 1432 (quotation omitted), thereby resulting in grand jury testimony sufficient for the grand jury to indict Mr. Martinez.[13] Thus, the government's argument that "no testimony in the Grand Jury transcript . . . was tainted by the Martinez testimony" is unsupported. *See* Docket No. 446 at 11.[14]

_____

[13]Although Mr. Martinez does not raise, and the Court does not address, the effect of the immunized testimony on prosecutorial decisions, it is worth noting that certain co-conspirators were not indicted, which raises the possibility that, had the transcripts not been available to the DEA, Mr. Martinez, too, may have ended up as an unindicted co-conspirator.

[14]To the extent the government's argument asks the Court to find that, based upon the Puff N Jewelry investigation, discovery of the relevant evidence in this case was inevitable, the Court declines the invitation. The test for inevitable discovery was set forth in *Nix v. Williams*, 467 U.S. 431 (1984), but the Tenth Circuit does not appear to have decided whether a showing of inevitable discovery can cure a *Kastigar* violation. The Supreme Court has not explicitly endorsed such a practice and, since *Nix* was decided, many courts have declined to apply the inevitable discovery test in the *Kastigar* context despite ample opportunity to do so. *See, e.g.*, *Schmidgall I*, 25 F.3d at 1529. *But see United States v. Kiser*, 948 F.2d 418, 422-23 (8th Cir. 1991) (affirming district court's decision not to suppress witness testimony because the testimony

### 4. Harmless Error

"If the evidence presented to the grand jury is not found to have been properly

derived from legitimate independent sources, then the indictment must be dismissed,

unless the error is held harmless, beyond a reasonable doubt." *Beery*, 678 F.2d at 863

(quotations and citation omitted).  At this stage the government is required to show that

the use of the immunized testimony before the grand jury was "inconsequential," *Ponds*,

454 F.3d at 328 (quotations omitted), such that "the indictment should be dismissed

unless the government establishes that the grand jury would have indicted even absent

---

contained information that was "from an independent source" and "would have
inevitably discovered this information by lawful means"); *United States v. Rinaldi*, 808
F.2d 1579, 1584 (D.C. Cir. 1987) (remanding, in part, for determination of whether
discovery of witness' identity was "inevitable").  In the absence of Tenth Circuit
precedent to the contrary, the Court is not persuaded that the inevitable discovery
doctrine applies in the *Kastigar* context in part because the concerns presented by
immunized testimony are unique.  The D.C. Circuit, albeit in a different context, noted
that the distinction between "the presentation to the grand jury of evidence that has
previously been unconstitutionally obtained," such as a coerced confession, and "that of
constitutionally-obtained evidence whose exposure to the grand jury amounts to a
constitutional violation in and of itself." *North II*, 920 F.2d at 947.  In the former
instance, the derivative use of a confession in violation of *Miranda* is "a matter of the
reach of the exclusionary rule" and requires balancing the "possible unreliability of the
confession and the need to deter the government from future violations of Fifth
Amendment rights." *Id.* at 948.  In the latter instance, "the use of immunized testimony
is never justified by such balancing considerations" because the defendant's testimony
is compelled by the promise that the prosecution will not use the compelled testimony in
any respect. *Id.* (citing *Kastigar*, 406 U.S. at 453).  Thus, the "presentation – 'use' – of
the testimony is precisely the proscribed act" and "is no different than if the grand jury
had itself forced the defendant to give incriminating answers and any indictment based
upon immunized evidence is no less tainted." *Id.* at 948-49.  It is therefore unclear that
inevitable discovery can, in every instance, cure a constitutional violation in such a
case.
     However, regardless of whether the inevitable discovery test is applicable, for the
reasons discussed above, the government falls short of establishing that the evidence
before the grand jury would have been "inevitably discovered . . . by lawful means."
*See Kiser*, 948 F.2d at 423.

that [tainted] testimony."  *See Nanni*, 59 F.3d at 1433; *see also United States v. Rogers*, 722 F.2d 557, 560 (9th Cir. 1983) ("While this statement . . . before the grand jury was improper, it was harmless in light of the more than adequate untainted evidence to support the indictment.").

Special Agent Marshall was the only witness to testify before the grand jury. Because the government largely fails to address the impact of the immunized testimony on Special Agent Marshall's investigation, the government has not provided sufficient evidence to facilitate the task of separating the tainted aspects from the untainted aspects, if any, of Special Agent Marshall's testimony.  Because the government has the burden of proving harmless error beyond a reasonable doubt, this failure does not inure to its benefit.  In spite of the government's argument to the contrary, Docket No. 446 at 10-11, the fact that Special Agent Marshall did not specifically mention the immunized testimony in front of the grand jury is irrelevant where, as here, the government has the burden of establishing that sufficient portions of his grand jury testimony were untainted. *See Kastigar*, 406 U.S. at 460.  Even assuming that Special Agent Marshall's grand jury testimony was untainted to the extent that it mirrored information he gathered prior to the September 19 meeting, the Court cannot conclude beyond a reasonable doubt that such evidence is sufficient to support the indictment of Mr. Martinez.  *See* Docket No. 443 at 58:2-4 ("Q.  And it's at that [September 19, 2013] meeting, is that the first time you hear anything about Mr. Martinez?  A.  Yes.").[15]  Because the government has failed to show

---

[15]At the hearing, the parties focused on those portions of Special Agent Marshall's grand jury testimony where Mr. Martinez or O's were mentioned by name. The Court notes this case would ordinarily require a far broader *Kastigar* inquiry.  Count One charges Mr. Martinez with conspiracy to defraud the United States and commit a

26

which portions of Special Agent Marshall's testimony – if any – were untainted, the Court has no basis upon which to conclude beyond a reasonable doubt that, absent Special Agent Marshall's tainted testimony, adequate evidence existed to return an indictment against Mr. Martinez.  As a result, the indictment against Mr. Martinez must be dismissed.[16]

## III. CONCLUSION

For the foregoing reasons, the government has failed to show that Mr. Martinez is "in substantially the same position as if [he] had claimed his privilege in the absence of a grant of immunity."  *See Hubbell*, 530 U.S. at 40 (quoting *Kastigar*, 406 U.S. at 458-459). It is therefore

**ORDERED** that the indictment [Docket No. 1] is dismissed as to defendant Orlando Martinez for violation of Mr. Martinez's Fifth Amendment rights.

---

violation of 21 U.S.C. § 841, which includes allegations that defendants "possessed, packaged, labeled, marketed, distributed and sold substances containing ADB-Pinaca and AB-Fubinaca" and that defendants manufactured, labeled and distributed products such as "10X" or "Sunburst"

> (1) to avoid DEA regulation as "controlled substances"; and (2) to avoid FDA regulation as "new drugs", including approving the labeling of "new drugs" by (a) falsely labeling their products as "not for human consumption" and (b) omitting adequate instructions for the use of their products for their actual intended use of "getting high".

Docket No. 1 at 8-9, ¶ 31-32.  Thus, the government is required to establish an independent source for all evidence presented to the grand jury in support of the conspiracy for which Mr. Martinez is charged, rather than, as the parties' arguments suggest, merely addressing those instances before the grand jury where Special Agent Marshall mentioned Mr. Martinez by name.

[16]The Court need not therefore reach the issue of what evidence must be suppressed at trial.

DATED February 26, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge